UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

THE GEILER COMPANY,               )
                                  )
                Plaintiff,        )
                                  )
        v.                        )        No. 4:22-mc-00001-TWP-KMB
                                  )
INTERNATIONAL ASSOCIATION OF SHEET )
METAL, AIR, RAIL AND TRANSPORTATION )
WORKS, et al.,                    )
                                  )
                Defendants.       )

## REPORT AND RECOMMENDATION ON
## JUDICIAL REVIEW OF ARBITRATION AWARD

Plaintiff The Geiler Company ("Geiler") was accused of violating a collective bargaining agreement ("CBA") between itself and Defendants The International Association of Sheet Metal, Air, Rail, and Transportation Workers and Local Union No. 24 (collectively, "the Union"). An arbitrator ruled in favor of the Union and imposed financial penalties on Geiler. Geiler now asks this Court to vacate the arbitration award for three reasons: (1) the Union's grievance was untimely; (2) the arbitration award violates Indiana's right-to-work law; and (3) the arbitrator imposed penalties that are not authorized by the CBA. For the reasons explained below, the Magistrate Judge recommends that the District Judge **DENY** Geiler's Motion to Vacate the Arbitration Award, [dkt. 33], and **GRANT** the Union's Motion to Enforce the Arbitration Award, [dkt. 35].

## I. BACKGROUND

### A. Parties to this Dispute

Geiler is a commercial plumbing and HVAC contractor that operates in Indiana, Kentucky, and Ohio. [Dkt. 34 at 2.] It is a signatory to a CBA with the Union. [*Id.*; dkt. 34-1.] In negotiating

the terms of the CBA, Geiler was represented by a multi-employer bargaining unit called the Sheet Metal Contractors Association of Greater Cincinnati, Inc. ("Sheet Metal Contractors Association"), which is not a party to this lawsuit.  [Dkt. 34-1]

### B.  Relevant CBA Provisions

Before describing the underlying dispute between the Parties, the Court will highlight the most relevant provisions of the CBA.

Article II addresses subcontracting.  [Dkt. 34-1 at 5.]  Article II § 1 prohibits Geiler from subcontracting work within the scope of the CBA "to any Contractor, Subcontractor or other person or party who fails to agree in writing to comply with the conditions of employment contained herein including, without limitations, those relating to Union Security, rates of pay and working conditions, hiring and other matters covered hereby for the duration of the project."  [*Id.*]

Article V addresses union security.  [*Id.* at 5-6.]  Article V § 1 obligates Geiler to "require membership in the Union, as a condition of continued employment, of all employees performing any work" within the scope of the CBA.  [*Id.* at 5.]  However, Article V § 3 contains a savings clause that states, "The provisions of this Article shall be deemed to be of no force and effect in any state, to the extent to which the making or enforcement of such provision is contrary to law." [*Id.* at 6.]

Article X addresses the grievance and arbitration process.  [*Id.* at 13-16.]  The process has two steps.  At step one, Geiler or the Union must submit a grievance, and the two sides must try to resolve the issue between themselves.  [*Id.* at 13.] Article X § 1 states, "Grievances must be raised within thirty (30) calendar days following the occurrence giving rise to the Grievance, or, if the occurrence was not ascertainable, within thirty (30) calendar days of first knowledge of the facts giving rise to the Grievance."  [*Id.*]  At step two, either side may file a notice of appeal to the Local

Joint Adjustment Board ("LJAB") for an arbitration hearing if direct resolution is unsuccessful. [*Id.* at 13-14.] Article X § 5 empowers LJAB "to render such decisions and grant such relief to either party as they deem necessary and proper, including awards of damages or other compensation." [*Id.* at 14.] Article X § 8 provides a separate grievance process for disputes involving the negotiation or renewal of the CBA. [*Id.* at 15-16.] Those disputes are ultimately heard by the National Joint Adjustment Board and not LJAB. [*Id.*]

Article XIV addresses the duration of the CBA. Article XIV § 5 provides that Geiler authorizes the Sheet Metal Contractors Association to serve as its Collective Bargaining Representative for all matters related to the CBA "unless this authorization is withdrawn by written notice to the Association and the Union at least one hundred-fifty (150) days prior to the current expiration dates of the [CBA]." [*Id.*]

**C.  Underlying Dispute and Arbitration**

In September 2020, Geiler bid on a project at Sunman-Dearborn Community Schools in St. Leon, Indiana. [Dkt. 34 at 3.] The bid named Metal Airways LLC ("Metal Airways") as a subcontractor for sheet metal work. [*Id.* at 3.] Metal Airways was not a signatory to the CBA during the time relevant to this dispute. [*Id.* at 3-4; dkt. 34-3 at 14-15.]

On September 22, 2020, a Union representative attended an in-person meeting with Geiler's Vice President, Reid Geiler. The details of this meeting are not in the record. The Union's notice of appeal indicates that the meeting concerned the issue of sheet metal subcontracting for the Sunman-Dearborn project. [*See* dkt. 34-2 at 2 ("9/22/20 . . . Meeting in Geiler office with [Mr. Geiler] over issue.").]

In October 2020, the Union representative sent Mr. Geiler several emails asking which sheet metal subcontractor Geiler was going to use for the Sunman-Dearborn project. [Dkt. 34-3

at 9.]  None of these emails mentioned Metal Airways or any other specific subcontractor.  [*Id.*]
Mr. Geiler did not respond to most of these emails.  [*Id.* at 10.]  In the last email that the Union
representative sent Mr. Geiler in October 2020, he asked for an in-person meeting to discuss the
matter.  [*Id.* at 10.]  Mr. Geiler responded, "No."  [*Id.*]

On January 21, 2021, the Union representative sent Mr. Geiler a letter stating that he
believed Geiler was violating the CBA by using Metal Airways as a sheet metal subcontractor on
the Sunman-Dearborn project.  [Dkt. 34-4 at 2.]  The letter states as follows:

> It has come to my attention that The Geiler Company may be using Metal Airways,
> LLC to perform work covered by the collective bargaining agreement ("CBA") and
> which traditionally has been performed by our members, some of whom are laid
> off and would be ready, willing, and able to work.  We are continuing to investigate
> the information we have received.  Please note that such transfer of bargaining unit
> work by subcontract or otherwise would be in violation of the CBA—including but
> not limited to Article II—and the National Labor Relations Act, and Local 24 would
> seek full enforcement of the CBA, including monetary damages.  On or before
> Friday, January 29, 2021, please provide a list of all jobs on which Metal Airways,
> LLC has received a subcontract from your company from August 1, 2020 to present.

[*Id.*]

On February 12, 2021, the Union submitted a notice of appeal.[1]  [Dkt. 34-2 at 2.]
The notice of appeal identified the issue as "Subcontracting or Assignment of Work" and alleged
that Geiler was in violation of Article II § 1.  [*Id.*]

This matter then proceeded to LJAB for arbitration.  The Union submitted a written
position statement for LJAB's consideration.  [Dkt. 34-3.]  In that statement, the Union argued that
its grievance was timely and that Geiler violated the CBA by using Metal Airways as a

---

[1] Curiously, the February 12, 2021, notice of appeal bears the title, "Sheet Metal Industry
Grievance Form."  [Dkt. 34-2.]  However, Geiler states that this document is the Union's notice of
appeal and that the letter the Union sent to Mr. Geiler on January 21, 2021, is the Union's grievance.
[*See* dkt. 34 at 10.]  The Union does not dispute this contention.  Accordingly, the Court will
assume that the Union's January 21, 2021, letter to Mr. Geiler is the Union's grievance, and that
the form the Union submitted on February 12, 2021, is the Union's notice of appeal.

subcontractor on the Sunman-Dearborn Project. [*Id.* at 5-23.] The Union argued that it was owed $494,125 in damages based on its estimate of the total work hours its members could have performed on the Sunman Dearborn Project and the hourly wages for Union workers under the CBA. [*Id.* at 25-32.]

It is not clear whether Geiler submitted a written position statement for LJAB's consideration. No such statement has been filed in this case, and the arbitration proceeding itself was not recorded. However, Mr. Geiler has submitted a sworn declaration to the Court that states the following:

> During this hearing, I presented argument to the Board that the project was governed under Indiana's Right-to-Work statute; thus, The Geiler Company was not in violation of Article II Section 1 of the Agreement. During this hearing, I also presented argument to the Board that the Union's grievance was untimely pursuant to a plain reading of the Agreement.

[Dkt. 34-7 at ¶¶ 4-5.]

LJAB ruled in favor of the Union and imposed a financial penalty on Geiler. [Dkt. 34-5.] In a letter explaining its ruling, LJAB stated:

> The LJAB determined that all procedural requirements had been met, that the grievance was timely, and was properly before the Board for consideration. Based upon the record and testimony of the parties, the LJAB rendered the following decisions:
>
> The Board finds that Geiler Company violated Article II; Section 1 of the collective bargaining agreement and that Geiler Company has a fine of $250,000, with half payable in thirty days with disbursement of payment as directed by Local No. 24; and half held in abeyance pending no further violation of the subcontracting clause, and that Geiler Company remains a part of the Association Bargaining Unit for the upcoming contract.

[*Id.*]

### D. Judicial Review and Clarification of Arbitration Award

After LJAB ruled in favor of the Union, Geiler sought judicial review in this Court in January 2022. [Dkt. 1.] The Parties initially disagreed about the basis for LJAB's ruling. [Dkt.

25.]  Geiler's understanding was that LJAB found that it had violated Article II § 1 by subcontracting work to a non-Union subcontractor and argued that this ruling was void because it violated Indiana's right-to-work law, which prohibits employers from forcing employees to join a union.  [*Id.* at 3-4.]  The Union saw things differently.  It argued that union security was not the basis for LJAB's ruling and that LJAB had ruled that Geiler was in violation of a subcontractor clause within Article II § 1.  [*Id.* at 4.]

On October 31, 2022, the Court remanded the case to LJAB for clarification.  [*Id.* at 4-5.] LJAB clarified its ruling in a letter:

> The Board further finds that the union security clause found in Article V, Section 1, and the passing reference to the clause found within Article II, Section 1 are not applicable to the work at issue, and irrelevant for the Board's determination.  *See Art. V, Sec. III*.  The issue before the Board explicitly concerned 'subcontracting or assignment of work,' as noted in Local 24's Grievance.  The issue was Geiler's subcontracting of sheet metal work to an entity (Metal Airways) that was not signatory [sic] to the Agreement, and union security was not a basis for the decision and award.

[Dkt. 34-8 at 2.]

Following LJAB's clarification, Geiler renewed its Motion to Vacate the Arbitration Award in this Court in July 2024, and the Union filed a Cross-Motion to Affirm the Arbitration Award. [Dkts. 33; 35.]  These motions are now fully briefed and ripe for the Court's review.  Chief Judge Tanya Walton Pratt entered an Order Referring Motion, designating the undersigned to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  [Dkt. 40.]

## II. STANDARD OF REVIEW

A court's role in reviewing a labor arbitration award is "very limited."  *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567 (1960).  "The courts . . . have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim."  *Id.*

6

at 568. "As long as the arbitrator's award 'draws its essence from the [CBA],' and is not merely 'his own brand of industrial justice,' the award is legitimate." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987). "When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's 'improvident, even silly factfinding' does not provide a basis for a reviewing court to refuse to enforce the award." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001). "In other words, the question presented to a federal court asked to set aside an arbitration award is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract." *United States Soccer Federation, Inc. v. United States National Team Players Association*, 838 F.3d 826, 832 (7th Cir. 2016) (cleaned up). "Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *Misco*, 484 U.S. at 38.

Judicial deference to arbitration, however, is not unlimited. "[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). A court is empowered to vacate an arbitrator's award if "the arbitrator had exceeded the powers delegated to him by the parties." *Dexter Axle Co. v. Int'l Ass'n of Machinists*, 418 F.3d 762, 768 (7th Cir. 2005). Because the arbitrator is typically limited to interpreting the contract, if "there is no possible interpretive route to the award," then a "noncontractual basis can be inferred and the award set aside." *Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc.*, 935 F.2d 1501, 1505-06 (7th Cir. 1991).

### III. DISCUSSION

Geiler raises three issues for the Court's review:  (1) whether the Union's grievance was untimely; (2) whether the arbitration decision violates Indiana's right-to-work law by requiring Geiler's Indiana subcontractors to hire Union members; and (3) whether LJAB exceeded its authority under the CBA by issuing a punitive financial penalty and suspending a portion of that financial penalty on the condition that Geiler remain in the Sheet Metal Contractors Association for the next renewal of the CBA.  The Court will address each issue in turn.

### A.  Timeliness of the Union's Grievance

Geiler argues that the Union knew that it had selected Metal Airways as the sheet metal subcontractor on the Sunman-Dearborn project in September 2020 but waited until January 2021 to submit a grievance.  [Dkt. 34 at 8-10.]  Article X § 1 of the CBA requires the Parties to submit a grievance "within thirty (30) calendar days of first knowledge of the facts giving rise to the Grievance."  [Dkt. 34-1 at 13.]  Thus, according to Geiler, the Union's untimely grievance renders the arbitration decision void.

In response, the Union argues that the issue is beyond the scope of the Court's review. [Dkt. 35 at 3.]  The Union specifically argues that issues of substantive arbitrability (*i.e.*, whether the parties have entered into an arbitration agreement and whether that agreement encompasses the subject matter of the dispute) are left to the courts.  [*Id.*]  By contrast, issues of procedural arbitrability (*e.g.*, timeliness of submitting a grievance) are left solely to the arbitrator.  [*Id.*] The Union also argues that its grievance was in fact timely and that LJAB's express finding on this issue should be affirmed.  [*Id.* at 4.]

Geiler replies that an arbitrator's findings about issues of procedural arbitrability, such as timeliness, are subject to judicial review under the same deferential standard as other arbitral

findings; that is to say, courts decide whether an arbitrator's timeliness finding "draw[s] its essence from the agreement." [Dkt. 38 at 4-6.] In this case, Geiler argues that there is "no question" that the Union knew it was using Metal Airways on the Sunman-Dearborn project for more than 120 days before it submitted a grievance and that there is no possible interpretation of the CBA that would permit a finding that the grievance was timely. [*Id.* at 6.] Geiler also argues that LJAB erred by failing to show its "interpretive reasoning" as to this issue. [*Id.*]

In its closing brief, the Union reiterates its position that issues of procedural arbitrability are left to the arbitrator and are beyond the scope of judicial review. [Dkt. 39 at 3-4.] The Union also argues that LJAB's timeliness finding was correct and that there is no authority for the proposition that an arbitrator must "show its interpretive reasoning" in issuing such decisions. [*Id.*]

Issues of procedural arbitrability such as timeliness are primarily left to arbitrators but are in fact reviewed by courts under the same deferential standard as other arbitral findings. The United States Supreme Court took up this issue in *BG Group, PLC v. Republic of Argentina*, 572 U.S. 25 (2014). There, the Supreme Court considered whether issues of procedural arbitrability are reviewed "*de novo*, or with the deference that courts ordinarily show arbitral decisions on matters the parties have committed to arbitration." *Id.* at 33. The Supreme Court held that "courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration" including "prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate." *Id.* at 34-35. By contrast, issues of substantive arbitrability concerning "whether there is a contractual duty to arbitrate at all" are generally reserved for the courts to decide. *Id.* at 35 (emphasis removed). Thus, courts cannot review issues of procedural arbitrability *de novo* and instead "must do so with considerable deference." [*Id.* at 41.]

In this case, the CBA's requirement that the Parties must submit a grievance within 30 days "of first knowledge of the facts giving rise to the Grievance" is a matter of procedural arbitrability. [Dkt. 34-1 at 13.] The Parties do not contest that there was a binding arbitration agreement encompassing the subject matter of the dispute. Accordingly, the Court will review LJAB's timeliness finding "with the deference that courts ordinarily show arbitral decisions on matters the parties have committed to arbitration." *BG Group, PLC*, 572 U.S. at 33.

Applying this standard to Geiler's timeliness argument, the Court finds that LJAB's timeliness finding draws its essence from the CBA and, thus, should be affirmed. Geiler's argument that there is "no question" that the Union knew it was using Metal Airways as a subcontractor on the Sunman Dearborn project as early as September 2020 is belied by the record. In October 2020, the Union representative sent Mr. Geiler several emails asking which subcontractor Geiler planned to use for the project's sheet metal work. [Dkt. 34-3 at 9.] Mr. Geiler did not respond to most of these emails and declined to meet with the Union representative to discuss the issue. [*Id.* at 10.] This correspondence supports a finding that the Union did not know which company had been selected as Geiler's sheet metal subcontractor for the project in September 2020, as Geiler argues here. Further, according to the Union's notice of appeal, the date of the violation was January 19, 2021, which was only two days before the Union submitted its grievance and well within the CBA's 30-day requirement. [Dkt. 34-2 at 2.] Given these circumstances, the undersigned finds that Geiler has not shown that LJAB completely ignored the CBA's timeliness requirement or that there was clear, uncontested, and indisputable evidence that the Union had inexcusably failed to meet this requirement.

A different arbitration panel perhaps could have been persuaded by other factors, such as the Union representative's meeting with Mr. Geiler in September 2020 about an "issue" related to

sheet metal subcontracting for the project.  [*Id.*]  But this Court's role in reviewing an arbitration award is very limited, and it will not reweigh conflicting evidence that was before LJAB at the time it rendered its decision.  *See Major League Baseball Players Ass'n*, 532 U.S. at 509 ("When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's 'improvident, even silly factfinding' does not provide a basis for a reviewing court to refuse to enforce the award.'").  What matters on judicial review is that there is a "possible interpretive route" for finding that the Union submitted its grievance within 30 days of learning about the issue underlying the dispute.  *Chicago Typographical Union No. 16*, 935 F.2d at 1506.  For this reason, the undersigned concludes that Geiler has not shown that LJAB failed to apply Article X § 1's timeliness requirement to this dispute.

Geiler offers no authority for its proposition that LJAB needed to do more to "explain its interpretive reasoning" in its written decision.  *See Hall v. Flannery*, 840 F.3d 922, 924 (7th Cir. 2016) (perfunctory and undeveloped arguments are forfeited).  To the contrary, the Seventh Circuit Court of Appeals has held the opposite and generally does not require arbitrators to explain their decisions in writing at all.  *See Ameren Illinois Co. v. Int'l Brotherhood of Electrical Workers*, 906 F.3d 612, 618-19 (7th Cir. 2018) ("[a]rbitrators are normally not required to write any opinion at all, and it is worth reiterating that a court's review of an arbitral award does not proceed under the same principles that would apply if it were reviewing a decision of the Social Security Administration or a bankruptcy court"); *see also Enterprise Wheel & Car Corp.*, 363 U.S. at 598 ("[a]rbitrators have no obligation to the court to give their reasons for an award"); *but see Bankers Life & Casualty Insurance Co. v. CBRE, Inc.*, 830 F.3d 729, 732-33 (7th Cir. 2016) (holding that while arbitrators are not generally required to provide written reasoning for their decisions and often do not, the parties may include such a requirement in the arbitration agreement itself).

Thus, the undersigned concludes that LJAB was not required to provide a more fulsome written analysis in rendering its decision on this issue, and its succinct written finding does not provide a basis for reversal.

In sum, district courts review arbitration rulings about timeliness and other matters of procedural arbitrability under the same highly deferential standard as other arbitral findings. In this case, the evidence does not support Geiler's contention that LJAB failed to apply the CBA's timeliness requirement to this dispute. Accordingly, the undersigned recommends that Geiler's request for relief on this issue be denied.[2]

### B. Substantive Basis for LJAB's Decision in Favor of the Union

Geiler argues that the CBA's union security provision violates Indiana's right-to-work law, which prohibits employers from forcing their employees to join a union. [Dkt. 34 at 17-20.] It further argues that LJAB's clarification letter stating that union security was not the basis for its ruling should be rejected because, according to Geiler, Article II § 1 of the CBA "under no uncertain terms applies the Union Security clause ***without limitations***." [Dkt. 34 at 15 (emphasis in original).] Thus, Geiler argues, the Union's clarification letter "is inapplicable and leaves two conclusions: (1) [LJAB] failed to read and interpret the CBA based on unambiguous language; or (2) [LJAB] understands the Union Security clause violates Indiana law and attempts to read it out of its Award and Article II § 1 to avoid the Court vacating the Award." [*Id.*]

_____

[2] In a single line in its opening brief, Geiler suggests that the Union's notice of appeal was also untimely. [*See* dkt. 34 at 10 ("The Union did not file its appeal until February 12, 2021—well more than the 30 day deadline for appeals outlined in the CBA.").] However, elsewhere in the same brief, Geiler acknowledges that the Union submitted its notice of appeal just 22 days after submitting its grievance. [*Id.* at 4.] The CBA requires the Parties to submit a notice of appeal within 30 days after the termination of the grievance procedure. [Dkt. 34-1 at 14.] Thus, the notice of appeal was timely and does not provide a basis to vacate the arbitration award.

In response, the Union asks the Court to accept LJAB's clarification that union security was not the basis for its decision. [Dkt. 35 at 9-10.] It points out that the CBA includes a savings clause that expressly nullifies the union security provision in states where that provision would be contrary to law. [*Id.* at 10.] Thus, the Union argues, the Court should reject Geiler's argument and accept LJAB's clarification letter, which states that "[t]he issue was Geiler's subcontracting of sheet metal work to an entity (Metal Airways) that was not a signatory to the [CBA]."[3] [Dkt. 34-8 at 3.]

Geiler replies that union security was the basis for the Union's grievance and argues that there is no evidence of any other violation of the CBA. [Dkt. 38 at 13-15.] Geiler concedes that "union standards clauses" requiring a subcontractor to agree in writing to abide by the labor standards set forth in a CBA "are generally lawful in the construction industry under the NLRA." [*Id.* at 13.] But in this case, according to Geiler, "[t]here is no evidence Metal Airways, LLC did not agree in writing to all other conditions of employment outlined in the CBA." [*Id.* at 14.]

In its closing brief, the Union argues that "a plain reading of the CBA dictates that the [union security] clause has no force or effect where it is contrary to law." [Dkt. 39 at 7.] The Union further argues that there was ample evidence before LJAB that Metal Airways had not agreed in writing to comply with the CBA's other labor standards. [*Id.*]

After reviewing the record, the undersigned finds that union security was not the basis for LJAB's decision against Geiler and that its decision was instead based on Geiler's decision to subcontract sheet metal work to a company that had not agreed in writing to abide by the CBA's other labor standards. Importantly, LJAB said exactly that in its letter clarifying its decision. [Dkt.

---

[3] The Union makes other arguments, including waiver based on Geiler's alleged failure to raise certain issues during the arbitration proceedings and an interpretation of Indiana's right-to-work law that would render the statute inapplicable to the Parties' CBA. [Dkt. 35 at 5-8.] Because the undersigned recommends a ruling in favor of the Union on other grounds, those arguments need not be addressed.

34-8 at 3.]   The letter also referenced the CBA's savings clause, which nullifies the union security requirement in states like Indiana that have a right-to-work law.   [*Id.*]   LJAB's reference to the savings clause shows that it understood that union security could not be the basis for a ruling against Geiler.   Geiler's accusation that LJAB intentionally misrepresented the basis for its decision to the Court in its clarification letter is an extremely serious allegation that is not supported by the record.

Geiler offers a strained interpretation of the CBA that would not likely succeed on *de novo* review, let alone on the highly deferential standard of review for arbitration decisions that is applicable here.   The savings clause expressly nullifies the union security provision in states where union security is contrary to law.  [Dkt. 34-1 at 6.]   Despite this clear language, Geiler argues that the CBA's union security provision was meant to apply in Indiana.   Geiler focuses on the words "without limitations" in Article II § 1 of the CBA, which prohibits Geiler from subcontracting work within the scope of the CBA "to any Contractor, Subcontractor or other person or party who fails to agree in writing to comply with the conditions of employment contained herein including, *without limitations*, those relating to Union Security, rates of pay and working conditions, hiring and other matters covered hereby for the duration of the project."  [Dkt. 34-1 at 5 (emphasis added).]   Under Geiler's interpretation, the phrase "without limitations" means that subcontractors must agree to hire only Union workers and that there are no exceptions to that requirement in states where union security requirements are unlawful.   This interpretation cannot be squared with the CBA's savings clause, which expressly states the opposite.   *See Franciscan Alliance Inc. v. Metzman*, 192 N.E.3d 957, 963 (Ind. Ct. App. 2022) (holding that courts "must examine the plain language of the contract, read it in context, and, whenever possible, construe it to render every word, phrase, and term meaningful, unambiguous, and harmonious with the whole").

LJAB plausibly interpreted Article II § 1 in ruling that Geiler had violated the CBA by subcontracting to a company that had not agreed in writing to abide by the labor standards in the CBA. Geiler itself concedes that Metal Airways was not a signatory to the CBA during the relevant period. [Dkt. 34 at 3-4.] Moreover, the Union submitted documentary evidence to LJAB that Metal Airways was not a signatory to the CBA during the relevant period. [Dkt. 34-3 at 14-15.] By contrast, there is no evidence that Metal Airways had agreed in writing to abide by the CBA's labor standards for the duration of the project. In its reply brief, Geiler speculates that it is possible that Metal Airways had entered into such a written agreement but does not point to anything in the record to support this assertion. [Dkt. 38 at 14.] Given the evidence and arguments that were before LJAB at the time it rendered its decision, its finding that Geiler violated the CBA by subcontracting with Metal Airways drew its essence from the CBA and must be affirmed.

Geiler's argument that the Union's grievance arose from its frustration that non-Union workers employed by Metal Airways were completing sheet metal work on the project that could have been performed by its members is unpersuasive. Whatever the Union's subjective motivations for pursuing arbitration may have been, its notice of appeal lists "Subcontracting or Assignment of Work" as the issue it sought to bring before LJAB, and it presented evidence of such during the arbitration hearing since Metal Airways was not a signatory to the CBA. [Dkts. 34-2 at 2; 34-3 at 14-15.] The notice of appeal thus put the issue of impermissible subcontracting before LJAB, and the evidence at the arbitration hearing supports the Union's allegation that Metal Airways had not agreed in writing to abide by the CBA's labor standards. Further, LJAB's clarification letter that union security had no bearing on its decision is clear and unequivocal.

In sum, LJAB found that Geiler violated the CBA by subcontracting sheet metal work to a company that had not agreed in writing to follow the CBA's labor standards. The record plausibly

supports this finding. Accordingly, the undersigned recommends that Geiler's request for relief on this issue be denied.

### C. Lawfulness of the Arbitration Award's Financial Penalty

Geiler argues that the CBA authorized LJAB to impose compensatory damages but not fines or punitive damages. [Dkt. 34 at 11-12.] It characterizes LJAB's $250,000 award as a fine that exceeded LJAB's authority under Article X § 5 of the CBA. [*Id.* at 11.] Geiler also argues that punitive damages are not available for breach of contract claims under Indiana law. [*Id.* at 11-12.] Geiler further argues that LJAB impermissibly inserted itself into renegotiations of the CBA by suspending half of this financial penalty on the condition that Geiler remain in the Sheet Metal Contractors Association for the upcoming CBA renewal. [*Id.* at 12-15.] Geiler notes that under Article XIV § 5, the Sheet Metal Contractors Association was the only entity that could function as its collective bargaining representative for renewals of the CBA. [*Id.* at 13.] Further, Article X § 8 provides its own grievance process for disputes arising out of future contract negotiations and tasks the National Joint Adjustment Board with resolving any such disputes; Geiler argues that LJAB's ruling suspending a portion of the financial award on the condition that Geiler participate in the next renewal of the CBA violates this provision. [*Id.*] Finally, Geiler argues that LJAB acted in a manifest disregard of Section 8(f) of the National Labor Relations Act ("NLRA") by requiring Geiler to participate in the next renewal of the CBA.

In response, the Union argues that the CBA does not prohibit LJAB from imposing fines or other punitive financial penalties. [Dkt. 35 at 4.] According to the Union, Article X § 5's language empowering LJAB to "grant such relief to either party as they deem necessary and proper" is broadly worded and gives LJAB significant discretion in imposing financial penalties. [*Id.*] Further, the Union argues that Geiler was already required to abide by the injunctive terms

set forth in LJAB's decision and that it merely needs to refrain from further violations of the CBA to avoid paying the second half of the financial award. [*Id.* at 5.] Finally, the Union argues that LJAB's award does not violate Section 8(f) of the NLRA because Article X § 8(a) of the CBA already provides for a continuing relationship between Geiler and the Sheet Metal Contractors Association in future contract renewals and because the only consequence Geiler would suffer by withdrawing from the Sheet Metal Contractors Association would be the payment of a suspended financial penalty. [*Id.* at 8]

Geiler replies that the financial award was punitive and not compensatory. [Dkt. 38 at 6.] It argues that "the only damages discussed in the CBA are compensatory in nature, [and] it is inappropriate to infer or find the parties granted [LJAB] the authority to issue punitive damages or fines." [*Id.*] It further states that LJAB erred by failing to explain how it arrived at the figure of $250,000. [*Id.* at 7.] Finally, Geiler reiterates its positions that Indiana law does not permit punitive damages for breach of contract suits and that Section 8(f) of the NLRA does not require Geiler to participate in future contract negotiations. [*Id.* at 6-8.]

In its closing brief, the Union reiterates its position that the award was rooted in the Union's lost wages and further argues that punitive awards are permitted in labor arbitration decisions. [Dkt. 39 at 4-5.] The Union also argues that if Geiler decides that it does not wish to remain in the Sheet Metal Contractors Association for the next round of CBA negotiations, it will merely have to pay the portion of the financial penalty that was held in abeyance and will not be required to pay an additional penalty for a new violation. [*Id.* at 5.]

Assuming for the sake of the argument that the financial penalty issued against Geiler is correctly characterized as a punitive award, the undersigned finds that LJAB did not exceed its authority under Article X § 5 in issuing this award against Geiler. First, the CBA does not expressly

prohibit punitive financial awards.  Geiler's argument that the express inclusion of compensatory damages as an available remedy in Article X § 5 to the exclusion of other forms of financial relief relies on the "maxim of *expressio unius est exclusion alterius*—the expression of one thing implies the exclusion of others." *Exelon Generation Co., LLC v. Local 15, Intern. Broth. Of Elec. Workers, AFL-CIO*, 676 F.3d 566, 571 (7th Cir. 2012).  This maxim is used by courts to resolve ambiguities in a text.  *Id.*  When the text of a CBA is ambiguous—*i.e.*, capable of more than one meaning— the Court's role is limited to determining whether there is a possible interpretative route to the award.  *United States Soccer Federation*, 838 F.3d at 832.  Second, Article X § 5 includes broad language empowering LJAB "to render such decisions and grant such relief to either party *as they deem necessary and proper*."  [Dkt. 34-1 at 14 (emphasis added)]; *see also*, *e.g.*, *Charles O. Finley & Co., Inc. v. Kuhn*, 569 F.2d 527, 534-35 (7th Cir. 1978) (arbitration case holding that an agreement authorizing Commissioner to take steps as he deems "necessary and proper" conferred broad power).  Taken together, the fact that the CBA does not expressly prohibit LJAB from issuing punitive financial awards coupled with LJAB's broad authority to grant relief as it deems "necessary and proper" permits an interpretation of the CBA that empowers LJAB to impose fines.  Given this Court's extremely limited and deferential role in reviewing arbitration decisions, Geiler's argument is unpersuasive.

Geiler's argument that Indiana law does not permit punitive damages in breach of contract disputes is also unpersuasive.  The CBA does not include a choice of law provision, and Geiler does not explain why this aspect of Indiana law would restrict LJAB's authority to grant such relief given the broad wording of Article X § 5.  Likewise, Geiler's argument that LJAB needed to provide a written analysis explaining how it arrived at the figure of $250,000 is unpersuasive for the same reasons explained previously in the analysis of Geiler's timeliness argument.  [*See supra*

at Sec. III-A (citing *Ameren Illinois Co.*, 906 F.3d at 618-19 (arbitrators are not required to provide written analyses supporting their findings)).]

The undersigned also finds that LJAB did not exceed its authority under Article XIV § 5 by suspending half of the financial award on the condition that Geiler remain in the Sheet Metal Contractors Association for negotiating the next renewal of the CBA.  If LJAB had "mandat[ed] the acceptance of the next agreement under the penalty of fine" and permitted the Union to use that suspended fine to "strong-arm Geiler to bend to its will in any renewal negotiations," [dkt. 34 at 14], then LJAB may have exceeded its authority under the CBA.  That is not, however, what happened here.  Instead, LJAB merely required Geiler to allow the Sheet Metal Contractors Association to act as its representative for the next round of contract negotiations with the Union to avoid paying half the financial award levied against it for violating the subcontractor clause. Indeed, that is actually Geiler's default obligation under Article XIV § 5.  [*See* dkt. 34-1 at 19 ("[t]he parties agree that the Employer will hereafter be a member of the multi-employer bargaining unit represented by said Association unless this authorization is withdrawn by written notice to the Association and the Union at least one hundred-fifty (150) days prior to the current expiration dates of the [CBA]").]  Contrary to Geiler's argument, the Sheet Metal Contractors Association—and by extension Geiler—has no obligation to agree to whatever terms the Union wishes to offer to avoid the imposition of a suspended financial penalty.  Geiler merely has to stay in that bargaining unit for the next contract renewal; it is not required to accept unfavorable terms. Geiler may be displeased with this outcome, but it does not violate Article XIV § 5 as Geiler claims.[4]

---

[4] LJAB also required Geiler to refrain from future violations of the subcontractor provision to avoid paying the suspended portion of the financial award.  [Dkt. 34-5 at 2.]  Geiler argues that this injunctive term requires that it continually violate Indiana's right-to-work law by

The Court finds that LJAB did not exceed its authority under Article X § 8 by suspending half of the financial award contingent upon Geiler remaining in the Sheet Metal Contractors Association for the upcoming renewal of the CBA.  Article X § 8 sets forth a separate grievance process for "any controversy or dispute arising out of the failure of the parties to negotiate a renewal of [the CBA]."  [Dkt. 34-1 at 15.]  Under that grievance process, the National Joint Adjustment Board, and not LJAB, serves as the arbitrator of any such dispute.  [*Id.*]  The suspended financial award does not infringe on the National Joint Adjustment Board's authority to resolve disputes arising in the course of future contract negotiations.  If Geiler chooses to remain in the Sheet Metal Contractors Association for the next contract renewal, such disputes would still proceed to the National Joint Adjustment Board, and not LJAB, for arbitration.  Accordingly, Geiler has not shown that LJAB exceeded its authority under Article X § 8.

Finally, Geiler has not shown that LJAB violated Section 8(f) of the NLRA by obligating it to remain in the Sheet Metal Contractors Association for the next round of contract negotiations. Geiler argues that this NLRA provision does not require employers that are engaged primarily in the building and construction industry to participate in subsequent contract negotiations with a union.  Yet Geiler cites no legal authority supporting the proposition that LJAB violated the NLRA by suspending a portion of the financial award on the condition that the company remain in the Sheet Metal Contractors Association for future contract negotiations.  Instead, Geiler cites a case from the Sixth Circuit Court of Appeals, which holds that an automatic renewal clause in a CBA does not violate Section 8(f) of the NLRA.  *See Elec. Workers Local 58 Pension Trust Fund v.*

---

subcontracting with companies that require union membership of their employees.  [Dkt. 34 at 17-19.]  As explained above, the union security portion of the subcontractor provision does not apply in Indiana.  Thus, LJAB has not required Geiler to violate Indiana law to avoid paying the suspended portion of the financial penalty by restricting it from further violations of the subcontractor provision.

*Gary's Elec. Service Co.*, 227 F.3d 646, 653 (6th Cir. 2000) ("an automatic renewal clause between the parties to an § 8(f) agreement will be given effect and operates to bind the parties to a continuation of the agreement."). Geiler also cites a case from the Seventh Circuit Court of Appeals, which holds that an arbitrator "may not direct the parties to violate the law." *George Watts & Sons, Inc. v. Tiffany and Co.*, 248 F.3d 577, 580 (7th Cir. 2001). However, neither of those cases nor any other case that Geiler cites stands for the proposition that an arbitrator acts in a manifest disregard of Section 8(f) of the NLRA by requiring a party to participate in negotiations of future contract renewals to avoid paying a suspended portion of a financial award.

In sum, LJAB neither exceeded its authority under Article X § 5 by issuing a punitive financial penalty against Geiler nor did it exceed its authority under Article X § 8, Article XIV § 5, or Section 8(f) of the NLRA by suspending half of that penalty on the condition that Geiler remain in the Sheet Metal Contractors Association to participate in negotiations for the next renewal of the CBA. Accordingly, the undersigned recommends that Geiler's request for relief on this issue be denied

## IV. CONCLUSION

For the reasons explained above, the Magistrate Judge recommends that the District Judge **DENY** Geiler's Motion to Vacate the Arbitration Award, [dkt. 33], and **GRANT** the Union's Motion to Enforce the Arbitration Award, [dkt. 35]. Any objections to this Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P 72(b). The failure to file objections **within 14 days** after service will constitute a waiver of subsequent review absent a showing of good cause for that failure. **Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.**

**SO ORDERED**.

21

Date: 1/23/2025

Kellie M. Barr
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email